## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

GARRETT DEVELOPMENT, LLC, an )
Oklahoma limited liability company, )
  )
         Plaintiff, )
  )
v. )   Case No. CIV-18-298-D
  )
  )
DEER CREEK WATER CORPORATION, )
an Oklahoma not for profit corporation, )
  )
         Defendant. )

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

On June 28, 29, and 30, 2021, the Court conducted a bench trial of the issues presented for decision in the Final Pretrial Report [Doc. No. 102]. Plaintiff Garrett Development, LLC, appeared through attorneys Mark Walker and Scott Butcher, and manager Pat Garrett. Defendant Deer Creek Water Corporation appeared through attorneys Carrie Vaughn and George Freedman, and corporate representative Debbie Wells. Upon consideration of the evidence, the case record, and the parties' arguments, the Court finds and rules as follows.

## FINDINGS OF FACT

1.     This action, brought pursuant to 7 U.S.C. § 1926(b), concerns the right of Deer Creek Water Corporation ("Deer Creek") to provide water service to Garrett Development, LLC's ("Garrett") proposed residential development.

2.     The claims are within the Court's jurisdiction pursuant to 28 U.S.C. § 1331.

3.      Garrett owns land in the NW/4 of Section 19-T14N-R3W, Oklahoma County, Oklahoma. This land is near the intersection of May Avenue and 206th Street. Garrett seeks to develop a 510 unit single-family home development on this land ("the Proposed Development").

4.      Deer Creek is a nonprofit water corporation formed pursuant to OKLA. STAT. tit. 18, § 863. Deer Creek provides rural water service to unincorporated areas of Oklahoma County north of Oklahoma City.

5.      Deer Creek is an obligor to the United States Department of Agriculture, Rural Development ("USDA") (formerly, the Rural Economic and Community Development Service ("FmHA")).

6.      Garrett submitted a renewed application to obtain water service for the Proposed Development from Deer Creek in 2018. *See* Def.'s Ex. 4.

7.      Deer Creek responded with its terms and conditions for providing service. Deer Creek agreed to provide service if Garrett complied with Deer Creek's terms, including:

   a. Constructing new 12" diameter mains to serve the Proposed Development;
   b. Extending the new mains 3,710 linear feet to connect to Deer Creek's existing mains;
   c. Drilling four successful water wells capable of serving the Proposed Development;
   d. Paying an impact fee of $2,500 per lot, which will be credited towards the cost of drilling four wells;
   e. Installing 3-phase electrical service to the four wells;
   f. Providing and installing meter cans, setters, curb stops, corp. stops, and service lines per Deer Creek's specifications;
   g. Paying a 4% inspection fee for all water system construction;
   h. Paying a membership fee;
   i. Transferring four well sites to Deer Creek; and

j.  Transferring Garrett's water rights to Deer Creek.

*See* Pl.'s Ex. 11.

8.      Debbie Wells, Deer Creek's corporate representative, testified that these terms are boilerplate language consistent with Deer Creek policies. Typically, the only changes are to the locations, line sizes, and number of wells needed.

9.      Garrett filed suit, seeking a declaratory judgment that Deer Creek "does not have a service area protected by 7 U.S.C. § 1926(b) and that obtaining water service for the Addition from another water provider does not violate 7 U.S.C. § 1926(b)." *See* Order [Doc. No. 71 at 2].

10.     The Court narrowed the issues on summary judgment. *See* Order [Doc. No. 71]. The Court ruled that Garrett was entitled to a determination as a matter of law that Deer Creek does not presently have the capacity to serve the Proposed Development. *Id.* at 16. Further, the Court ruled that Deer Creek was entitled to a determination as a matter of law that the necessary improvements required by its terms and conditions could be completed within a reasonable time. *Id.* The Court also held that "[w]hether the costs associated with the improvements result in services not being made available for Plaintiff remains for trial." *Id.*

11.     As to costs, the evidence at trial showed that Deer Creek is requiring Garrett to drill at least four new wells capable of producing water of sufficient quantity and quality. Bill Myers, Deer Creek's expert, acknowledged that the water from these four wells will be the source of water for the Proposed Development. *See* Pl.'s Ex. 11, at 2.

12.     Myers estimated the cost of one water well is $400,000, and this is based on the cost of previous wells with an added "engineering cost." Myers acknowledged that the actual cost of the wells could be higher or lower. For four wells, Myers estimated a total cost of $1,600,000. Garrett's expert, Timothy Johnson, acknowledged that the $400,000 estimate was a fair number. *See also* Pl.'s Ex. 91 at 3; Def.'s Ex. 7 at 6.

13.     The evidence at trial clearly showed that Deer Creek is requiring Garrett to bear all risks associated with drilling the four wells. The well construction, however, is under Deer Creek's purview. Deer Creek will select the contractor and choose the well locations.

14.     Drilling a new well first requires test wells. The estimated cost of each test well is $40,000. There is no limit on how many test wells Garrett might have to drill. The evidence showed that if more than four test wells are required to obtain water of sufficient quantity and quality, Garrett will also be required to bear those additional costs. The additional costs include the possibility of purchasing water rights from other landowners to obtain sufficient water. Debbie Wells testified that Garrett would be free to stop drilling test wells at any time.

15.     The cost of the new wells will be credited toward the required impact fees. Deer Creek charges an impact fee of $2,500 per lot. For 510 lots, this is $1,275,000. Debbie Wells and Bill Myers acknowledged that the impact fee represents the customer's pro rata share of the cost of the wells and related infrastructure necessary to supply water to the customer. Deer Creek, through its terms and conditions, is requiring Garrett to pay

approximately $1,600,000 to drill new wells. This assumes that only four test wells will be needed.

16.     Deer Creek is also requiring Garrett to provide 3-phase electrical power to the four wells. *See also* Pl.'s Ex. 11. At trial and in his expert report, Bill Myers estimated this cost to be $50,000. *See* Def.'s Ex. 7 at 6. Pat Garrett testified that he would not normally install 3-phase power to the Proposed Development. Myers testified that he included this cost in his report, but that sometimes the developer is not charged an additional cost by the electric utility company for 3-phase power. *See* Def.'s Ex. 79. If Garrett is charged to obtain 3-phase power, the maximum cost is approximately $50,000.

17.     Deer Creek is also requiring Garrett to transfer its water rights to Deer Creek. However, the evidence showed that Deer Creek has paid other owners, including Deer Creek customers, $300 an acre for their water rights. *See* Pl.'s Ex. 33.

18.     Deer Creek is further requiring Garrett to transfer surface rights for the well locations to Deer Creek. This requires Garrett to transfer four 50-by-50 foot well locations to Deer Creek. In the past, Deer Creek has paid others $3,400 for a 50-by-50 well location. *See* Pl.'s Ex. 33.

19.     At trial, Bill Myers provided a hydraulic analysis to show how he arrived at the need for four wells. The model provides an extended period simulation using peak day usage.

20.     Myers testified that his goal was to maintain existing system pressures of 65-75 psi. Myers looked at average systemwide pressures, and concluded he did not want to reduce the average by more than .5 psi based on the addition of Garrett's Proposed

Development. Myers selected this number based on his own experience, and testified that he did not know of any publication, statute, or regulation requiring him to use .5 psi as the target. Myers added one well at a time to the model, and he then examined systemwide pressures with the addition of the new well. Myers stopped at four wells when the model achieved his desired result.

21.    Myers acknowledged that the Oklahoma Department of Environmental Quality's minimum required pressure is 25 psi, but he testified that this is likely outdated.

22.    Myers also testified that he had previously developed plans for rural water districts where he found 35 psi to be appropriate.

23.    Systemwide pressures vary based on the system's connections, elevations, demand, and customer locations. Myers testified that to ensure customers on the west side and north side of Deer Creek's system have adequate water, Deer Creek has to maintain an average of 65 to 75 psi.

24.    The evidence showed that adding four wells to Deer Creek's system will increase the average systemwide pressure by .29 psi. Moreover, the excess water produced by the four wells will go outside the Proposed Development and benefit the overall system. Debbie Wells testified that Garrett will not get any credit, refund, or rebate for this excess water.

25.    The evidence at trial showed that other water providers do not require their customers to drill water wells. Timothy Johnson, Garrett's expert, testified that in other projects he was involved in, the provider did not require the developer to drill water wells.

6

Bill Myers, Deer Creek's expert, testified that in other § 1926(b) cases he was involved in, the developer was never required to drill water wells as a condition of receiving service.

26.     Deer Creek requires customers to pay two initial fees, a membership fee and an impact fee. Debbie Wells and Bill Myers testified that a developer is required to pay one membership fee of $1,500. However, a membership fee must be purchased for each lot before water service can be established for that home. Therefore, someone must pay 510 membership fees before Deer Creek will supply water to the 510 lots in the Proposed Development. This could be the developer, the builder, or the eventual homeowner. As a practical matter, however, in order to use water during the construction process at a particular lot, the membership would have to be purchased. At trial, Pat Garrett testified that he was uncertain whether Garrett would serve as the builder for all or part of the Proposed Development.

27.     The membership fee covers the cost of the water meter. Debbie Wells and Bill Myers testified that 5/8-inch water meters cost approximately $150 to $200. The associated membership fee is $1,500. A 1-inch meter costs approximately $300, and the membership fee is $2,500. Pat Garrett testified that his preference for the development is to use 1-inch meters.

28.     Both experts compared Deer Creek to other water providers to assess their costs and fees.

29.     Timothy Johnson compared seven water providers to Deer Creek based on their proximity, size, and type. *See* Pl.'s Ex. 84 at 4–5. Bill Myers compared Deer Creek to twelve providers. *See* Def.'s Ex. 12.

30.     In Johnson's comparison, the average impact fee charged per lot for a 5/8-inch meter was $1,167.57. The average for a 1-inch meter was $1,501.00. In Myers's comparison, he included three providers that charged a set impact fee: $1,350; $500; $1,000; and one that charged a varying range of $250-$1,000 based on the number of meters. Deer Creek charges an impact fee of $2,500 regardless of meter size.

31.     As to membership fees, in Johnson's comparison the average fee per lot was $328.04 for 5/8-inch meters and $351.72 for 1-inch meters. In Myers's comparison, the average fee was $1,444.17. Deer Creek charges $1,500 for 5/8-inch meters and $2,500 for 1-inch meters.

32.     Both experts presented evidence that some providers charge impact fees and membership fees, but few charge both. Between the two comparisons, there were sixteen different providers. Of the sixteen, only five charged both fees.

33.     Deer Creek requires Garrett to pay an inspection fee of 4% on water line construction. This does not apply to water well construction because Deer Creek is constructing the water wells with the cost of said wells borne by Garrett. This inspection fee cost is estimated at $99,938.64. *See* Def.'s Ex. 79. This is based on 4% of the sum of the main extension cost, $200,006.10, and the interior main cost of $2,298,460. *Id.*

34.     Deer Creek requires Garrett to pay for a two-year maintenance bond on the water line construction, at 3% of the cost of the 12" border main extension and the cost of the interior mains. *See* Def.'s Ex. 79. This results in a cost of $74,953.98. After the two years expire, Deer Creek assumes responsibility for maintenance of the water lines.

35.     The evidence showed that Deer Creek will be required to maintain the new water wells and water lines (after the expiration of the maintenance bond). Deer Creek will also pay for future infrastructure improvements related to the system.

36.     Evidence at trial demonstrated that Deer Creek operated at a profit in 2017 of $473,630. *See* Pl.'s Ex. 46. Debbie Wells testified that, for the bottom line, based on existing averages in 2017, the proposed 510 unit development would generate additional revenue of approximately $96,620. Based on the averages in 2017, Deer Creek makes an approximate profit of 22% on water sales.

37.     Garrett asserts that the total costs to connect to Deer Creek's system are $4,128,793.00. *See* Pl.'s Ex. 90(A). Deer Creek asserts that the total costs are $1,976,398.72. *See* Def.'s Ex. 79. In making this assertion, Deer Creek omits the costs of all but one membership fee, 3-phase power, the value of the water rights, and the value of the well locations. *Id.* Garrett includes a $400,000 contingency in the cost of the wells, and Deer Creek asserts that it is built into the $1,600,000 estimate. *Id.* Deer Creek uses a lower estimate for the cost of the 12" mains, inspection fee, and the maintenance bond. *Id.*

38.     The uncontroverted evidence showed that Deer Creek is unwilling to bear any of the initial costs associated with supplying water to the Proposed Development. Garrett will be required to pay all associated costs, and bear all attendant risks, for the initial provision of water service to the Proposed Development.

## CONCLUSIONS OF LAW

The USDA administers a loan program to provide funds to rural water associations, including corporations not operated for profit, "to provide for the application or establishment of . . . the conservation, development, use, and control of water . . . and to furnish financial assistance or other aid in planning projects for such purposes." 7 U.S.C. § 1926(a)(1). Subsection (b) provides that water "service provided or made available through any such association shall not be curtailed or limited by inclusion of the area served by such association within the boundaries of any municipal corporation or other public body. . . ." 7 U.S.C. § 1926(b).

To qualify for protection from curtailment, the water provider must (1) have a continuing indebtedness to the FmHA and (2) have provided or made service available to the area. *Rural Water Dist. No. 4, Douglas Cnty., Kan. v. City of Eudora, Kan.*, 659 F.3d 969, 976 (10ᵗʰ Cir. 2011); *Sequoyah Cnty. Rural Water Dist. No. 7 v. Town of Muldrow*, 191 F.3d 1192, 1197 (10th Cir. 1999). "Doubts about whether a water association is entitled to protection from competition . . . should be resolved in favor of the FmHA-indebted party seeking protection for its territory." *Sequoyah*, 191 F.3d at 1197. The Court previously ruled that Deer Creek is an entity entitled to protection, and it has been indebted to the USDA since the 1990s. *See* Order [Doc. No. 71].

The second prong of § 1926(b) looks to whether the water association made service available to the disputed area. *Sequoyah*, 191 F.3d at 1197. The Tenth Circuit relies on the "pipes in the ground" test to make this determination. *Id.* at 1203. The inquiry is "whether

the association has proximate and adequate 'pipes in the ground' with which it has served or can serve the disputed customers within a reasonable time." *Id.* The Court previously ruled that Deer Creek's existing infrastructure is incapable of providing water to the Proposed Development. *See* Order [Doc. No. 71]. The Court also ruled that the improvements could be completed within six months, and this is a reasonable time. *Id.*

At trial, the remaining inquiry was whether Deer Creek's costs and terms were so excessive that it did not make service available under § 1926(b). "There is some point at which costs become so high that assessing them . . . constitutes a practical deprivation of service." *Rural Water Dist. No. 1, Ellsworth Cnty., Kan. v. City of Wilson, Kan.*, 243 F.3d 1263, 1271 (10th Cir. 2001). Thus, the rates must not be "unreasonable, excessive, and confiscatory." *Id.* The Tenth Circuit has found several factors relevant in the cost analysis:

> (1) whether the challenged practice allows the district to yield more than a fair profit;
> (2) whether the practice establishes a rate that is disproportionate to the services rendered;
> (3) whether other, similarly situated districts do not follow the practice;
> (4) whether the practice establishes an arbitrary classification between various users.

*Ellsworth*, 243 F.3d at 1271. No one factor is dispositive, and courts should assess the totality of the circumstances. *Id.* Upon consideration of the facts established by the evidence, the Court finds that Plaintiff has proven by a preponderance of the evidence that Defendant's costs are unreasonable, excessive, and confiscatory. *See Moongate Water Co., Inc. v. Doña Ana Mutual Domestic Water Consumers Ass'n*, No. CIV-02-1615 RB/LCS, 2004 WL 7337668, at *6 (D.N.M. Aug. 23, 2004) (discussing the burden of proof for § 1926(b) and applying the preponderance standard).

11

## I.      More Than a Fair Profit

Garrett asserts that Deer Creek is recovering more than a fair profit. Specifically, based on its terms and conditions for service, Deer Creek is receiving system upgrades while requiring Garrett to pay for all costs and assume all risks associated with the initial provision of water to the Proposed Development. The evidence showed that the water from the four required wells will be the complete source of water for the Proposed Development. The evidence also showed, however, that excess water from these wells will go outside the development—benefitting Deer Creek's other users. Deer Creek will profit from this additional water without bearing any cost or risk to obtain it. Garrett will not receive any refund, credit, or rebate from the sale of the excess water.

The evidence showed that drilling four new wells improves Deer Creek's system by a systemwide average increase of .29 psi. Deer Creek's expert, Bill Myers, used a hydraulic model to arrive at the need for four wells. Myers testified that he wanted to maintain systemwide average pressures of 65-75 psi. His goal was to ensure that existing pressures did not decrease by more than .5 psi. The evidence showed that Myers selected this number based on his experience. Systemwide pressures, however, vary greatly based on connection points and customer locations. Some of Deer Creek's existing customers may never achieve the preferred systemwide pressure because of existing pipe size and location. Myers acknowledged that the Oklahoma Department of Environmental Quality requires a minimum of 25 psi, and Myers has found 35 psi to be sufficient for other rural projects.

Additionally, the costs of drilling the required wells are a moving target, making it difficult for Garrett to accurately estimate its costs. The evidence shows that Garrett must

drill test wells to determine whether the well locations will provide water of sufficient quantity and quality. These test wells cost an estimated $40,000 each. Garrett will bear all of these costs, while Deer Creek has complete discretion in choosing the locations, the contractor, and deciding whether the water is sufficient. If a test well proves to be insufficient, Garrett is responsible for the additional costs associated with drilling new test wells. There is no limit, other than Garrett's ability to endure additional costs, on the number of test wells that Garrett might have to drill. Although Debbie Wells testified that Garrett may stop drilling test wells at any time, failure to complete the test wells would jeopardize Garrett's investment and forfeit the ability to proceed with the project.

Furthermore, Deer Creek is charging Garrett $2,500 per lot in impact fees. The impact fees purportedly account for each lot's pro rata share of the wells and associated infrastructure that are necessary to provide water service. For 510 lots, the impact fee cost is $1,275,000. Deer Creek will credit the costs of drilling the new wells toward the impact fees. Garrett is required to drill four wells—each with an estimated cost of $400,000. This results in a total cost of $1,600,000—which exceeds any impact fee credit by $325,000. The cost of necessary test wells would increase the gap between the impact fee credit and Garrett's out-of-pocket costs by an additional amount of $40,000 per test well.

Here, Garrett is being required to bear the costs and risks associated with the provision of water service to the development, but Deer Creek reaps substantially all of the benefits. The evidence showed that drilling the water wells will improve the capacity and performance of Deer Creek's system. Deer Creek will be able to sell the excess water while taking no risk in obtaining it. Deer Creek has sole discretion in determining where to drill

the wells and who will do the drilling. Deer Creek also determines whether the wells produce sufficient water. Once the wells are established, the water produced and associated water rights become the property of Deer Creek. Additionally, although the impact fees purport to be tied to a pro rata share of each lot's associated costs, Garrett is required to bear costs exceeding the total impact fees by at least $325,000 for the wells alone—and this assumes that the test wells are all successful and other well costs do not exceed the estimated $1,600,000.

Finally, at the time of Garrett's renewed application for water service, Deer Creek had annual net revenues exceeding $470,000, selling water at approximately a 22% profit margin. The Court finds that this factor weighs in favor of Garrett.

## II.    Disproportional to the Services Rendered

The next *Ellsworth* factor looks to whether Deer Creek's terms and conditions of service establish a rate that is disproportional to the services rendered.

About the only initial service to be performed by Deer Creek in connection with establishing water service for the Proposed Development, and which involves an expense to Deer Creek, is the setting of water meters at each lot. The evidence showed that Deer Creek's membership fee covers the cost of the water meter. Debbie Wells and Bill Myers testified that 5/8-inch meters cost approximately $150 to $200. The associated fee is $1,500. Further, a 1-inch meter costs about $300, and the membership fee is $2,500. Deer Creek asserted that the membership itself provides value, and the value increases over time. Aside from generally asserting the membership's value, neither Debbie Wells nor Bill

Myers could justify the difference between the cost of the meter provided by Deer Creek and the membership fee.

Furthermore, throughout the trial, Deer Creek continually asserted that Garrett is required to pay only one membership fee. However, if Garrett chooses to also serve as the home builder, it will be forced to pay a membership fee for each lot before Deer Creek will provide water service to that lot. Although the cost could potentially be recouped when the builder sells the homes, the membership fees are still an upfront cost that the developer (Garrett) or builder (potentially Garrett) must pay to acquire water service necessary for construction. Of course, as previously discussed, Deer Creek will enjoy water sales to the 510 unit development going forward (without incurring any initial infrastructure costs) in the estimated amount of $96,000 annually, representing an approximate 22% profit margin. Moreover, the four required new wells will generate water in excess of the needs of the development, inuring to the benefit of Deer Creek.

Thus, the Court finds that the rate charged—as represented primarily by the membership fee per lot—is disproportionate to the services rendered.

### III.    Similarly Situated Districts

Both experts, Timothy Johnson and Bill Myers, testified that they are not aware of water providers, other than Deer Creek, which require a customer to drill its own well as a condition of receiving service. Furthermore, both experts performed a comparison of Deer Creek's costs and fees with those of other similarly situated water providers.

Tim Johnson, Garrett's expert, compared Deer Creek to seven water providers based on the providers' location and the size of their system. Johnson's comparison illustrated

that Deer Creek's average impact fees and membership fees were significantly higher than the seven other providers. The average impact fee for a 5/8-inch meter was $1,167.57, and a 1-inch meter was $1,501. Deer Creek charges an impact fee of $2,500, regardless of meter size. The average membership fee was $328.04 for a 5/8-inch meter, and $351.72 for a 1-inch meter. Deer Creek charges $1,500 and $2,500, respectively, for its meters.

Deer Creek attempted to discredit Johnson's comparison by asserting that he did not ask the comparators exactly what their terms and conditions would be for a 510 unit development. This, however, would go to the infrastructure costs associated with servicing the addition. Importantly, Deer Creek imposes the same membership fees and impact fees regardless of the size of the development.

Bill Myers, Deer Creek's expert, compared Deer Creek to twelve water providers. Myers's comparison also illustrated that Deer Creek charged fees that were higher than the other providers. Myers's providers charged an impact fee of $1,350, $500, and $1,000. One provider charged an impact fee that varied between $250 and $1,000 based on the number of meters used.

Both comparisons showed that some providers charge impact fees or membership fees—but few charge both. Of the sixteen providers, only five charged both an impact fee and a membership fee. Thus, the Court finds that this factor weighs in favor of Garrett.

## IV.   Arbitrary Classification

The final *Ellsworth* factor looks to whether Deer Creek's practices establish an arbitrary classification between users.

Deer Creek provided its terms and conditions of service in a letter to Garrett in 2018. At trial, Debbie Wells testified that those terms and conditions are consistent with Deer Creek's standard policies. She testified that the letter constituted boilerplate language, and often the only changes in service letters are to the locations of the water lines, the sizes of the lines, and the number of wells.

At trial, the evidence showed that Deer Creek requires some but not all of its members to transfer their water rights or surface rights. In the past, Deer Creek has paid some but not all of its members in exchange for their water or surface rights. Here, Deer Creek's proposed terms and conditions require Garrett to transfer its water and surface rights to Deer Creek without payment for such rights. Although Garrett is required to cover the costs to drill wells, pay for line extensions, potentially pay for 3-phase power, pay inspection fees, and post a maintenance bond, not all members are required to do these things as a condition of service. The only explanation offered for this differing treatment was that these decisions are made unilaterally by Deer Creek based on "obvious need." *See* Trial Transcript 348:25, June 29, 2021.

Viewing this evidence in the totality of the circumstances, the Court finds that Deer Creek's practices establish an arbitrary classification between users. Deer Creek failed to adequately account for the differential treatment between its members. Thus, bearing in mind the *Ellsworth* factors, the Court finds that Deer Creek's costs and fees are excessive, unreasonable, and confiscatory such that Deer Creek has not made service available to Garrett.

**CONCLUSION**

For all of the foregoing reasons, The Court concludes that Deer Creek's fees and costs are excessive, unreasonable, and confiscatory as they relate to Garrett and the Proposed Development. Deer Creek sought to require Garrett to, *inter alia*, provide all necessary infrastructure, provide water (and excess water) from four new wells, convey its water rights to Deer Creek, pay impact fees and at least one (but likely more) membership fee, pay inspection fees, and provide a two-year maintenance bond.  Deer Creek would then sell the water provided by Garrett to residents of the development going forward, at a significant profit. As a result, Deer Creek has failed to make service available to Garrett. Therefore, under the specific facts and circumstances of this case, Garrett is not required to obtain service from Deer Creek and is free to obtain water from any other provider. The Clerk is directed to enter a final judgment on all claims and counterclaims resolved by this Order as set forth herein.

**IT IS SO ORDERED** this 16th day of August, 2021.

TIMOTHY D. DeGIUSTI
Chief United States District Judge